1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JASON MARK HART,

                            Plaintiff,

        v.

DAN SCHNEEWEISS, et al.,,

                            Defendant.

CASE NO. C19-01193-RAJ-BAT

**REPORT AND
RECOMMENDATION**

13    Plaintiff, Jason Mark Hart, proceeds pro se in this civil rights action pursuant to 42

14  U.S.C. § 1983. Dkt. 4. Plaintiff is a prisoner currently housed at the Monroe Correctional

15  Complex (MCC) in Monroe, Washington. *Id.* He brings claims against defendants PMHNP

16  Calvin Cogburn and Dr. Dan Schneeweiss, both medical personnel at MCC and Department of

17  Corrections (DOC) employees. *Id.* Plaintiff alleges that defendants violated his rights by ordering

18  the involuntary administration of antipsychotic medication during January and February of 2018.

19  *Id.* Specifically, he alleges that from approximately January 22, 2018 to February 13, 2018, he

20  was involuntarily forced to take antipsychotic medication on an emergency basis more than

21  twice in less than thirty days in violation of Department of Corrections (DOC) policy. *Id.*

22    Plaintiff also alleges he was improperly placed at custody level I and was "purposefully

23  misdiagnosed" and forced to take medication "to cover for a level 3 grievance against Dr. Daniel

REPORT AND RECOMMENDATION - 1

Varnell at Washington State Penitentiary." *Id.* He alleges defendants used excessive force and failed to complete use of force reports for each of the injections. *Id.* Plaintiff alleges the antipsychotic medications caused "chest pain, hardening of heart and kidneys, as well as liver" and that it "may have contributed to my major neurocognitive disorder, shortening attention span, further lead to memory deficits" and that administration of the medication caused him "mental anguish and psychological distress." *Id.*

Plaintiff alleges defendants' actions violated his Fourth, Eighth, and Fourteenth Amendment (Due Process) rights under the United States Constitution and constituted assault and battery under Washington state law. *Id.* Plaintiff seeks injunctive relief in the form of additional training to all DOC corrections officers and sergeants on DOC's policy for the involuntary administration of antipsychotic medication. *Id.* He also requests $19,000,000.00 in monetary damages. *Id.*

Defendants now move for summary judgment and dismissal of all of plaintiff's claims. Dkt. 19. Defendants also ask that plaintiff's claims be deemed "frivolous" and that the dismissal of the action be considered a "strike" under 28 U.S.C. § 1915(g). *Id.* Plaintiff opposes the motion. Dkt. 25. For the reasons below, the undersigned recommends that defendants' motion for summary judgment be granted in part and denied in part. Specifically, the undersigned recommends that the motion be granted in its entirety with respect to defendant Schneeweiss and that all claims against him be dismissed. With respect to defendant Cogburn, the undersigned recommends the motion be granted with respect to plaintiff's Fourth Amendment, Eighth Amendment, Fourteenth Amendment substantive Due Process claims, and state law assault and battery claims and denied without prejudice with respect to plaintiff's Fourteenth Amendment procedural Due Process claims. The undersigned recommends that to the extent plaintiff intends

to raise retaliation claims against the named defendants based on his classification as custody level I these claims should also be dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915A. The undersigned recommends that defendants' request that plaintiff be assessed a "strike" under 28 U.S.C. 1915(g) be denied. Plaintiff's remaining claims should be referred back to Hon. Brian A. Tsuchida for further proceedings.

## EVIDENCE RELIED UPON

Defendants submit the following evidence in support of their motion for summary judgment: declaration of DOC Administrative Assistant Dianna Rule; declaration of DOC Health Services Manager, Rachael Symon; DOC Policy 620.540 (Involuntary Antipsychotic Administration), Revision Date December 24, 2015; Primary Encounter Reports by Calvin Cogburn, PMHNP, dated January 25, 2018, February 1, 2018, and February 6, 2018; Involuntary Antipsychotic Report dated February 6, 2018, by Arthur G. Davis, Ph.D.; Involuntary Antipsychotic Report dated February 7, 2018, by Calvin Cogburn, PMHNP; Notice of Involuntary Antipsychotic Hearing (24 hour) dated February 22, 2018; 14 Day Antipsychotic Hearing Minutes; Decision of Involuntary Antipsychotic Hearing Committee; Superior Court Cause No. 13-1-01982-6 Warrant of Commitment; Grievances Log I.D. Number 1865077 dated February 22, 2018, February 23, 2018, and March 1, 2018; video evidence of the involuntary administration of antipsychotic medication on January 25, 28, and 29, 2018 and February 1, 2, 3, 4, 6, 7, 8, 10, and 11, 2018. Dkts. 20, 21, 22, 33.[1]

## STATEMENT OF MATERIAL FACTS

---

[1] The Court notes that the first copy of the CD submitted by defendants was not viewable in its entirety and the Court directed defendants to submit a new copy of the CD. *See* Dkt. 28. The Court further notes that plaintiff also submitted a copy of a CD containing the same video evidence as submitted by defendants. Dkt. 32.

REPORT AND RECOMMENDATION - 3

1

**A.      DOC Policy 630.540 (Involuntary Antipsychotic Administration)**

2          Department of Corrections Policy 630.540 (Involuntary Antipsychotic Administration),

3    establishes DOC's procedures for the involuntary administration of antipsychotic medication to

4    an offender suffering from a mental disorder who, as a result of the mental disorder, is gravely

5    disabled or presents a likelihood of serious harm to self, others, or property, as defined in RCW

6    70.96A.020. Dkt. 20, Declaration of Rachel Symon ("Symon Decl."), Exh. 1 (DOC Policy

7    630.540). Under the version of RCW 70.96A.020 in effect at the time, an offender is considered

8    "gravely disabled" if the offender is "in danger of serious physical harm resulting from a failure

9    to provide for his or her essential human needs of health or safety" or if the offender "manifests

10   severe deterioration in routine functioning evidenced by a repeated and escalating loss of

11   cognition or volitional control over his or her actions and is not receiving care as essential for his

12   or her health or safety." RCW 70.96A.020(11).

13         Further, an offender presents a "likelihood of serious harm" if there is "a substantial risk

14   that: (i) Physical harm will be inflicted by an individual upon his or her own person, as

15   evidenced by threats or attempts to commit suicide or inflict physical harm on one's self; (ii)

16   physical harm will be inflicted by an individual upon another, as evidenced by behavior that has

17   caused the harm or that places another person or persons in reasonable fear of sustaining the

18   harm; or (iii) physical harm will be inflicted by an individual upon the property of others, as

19   evidenced by behavior that has caused substantial loss or damage to the property of others[.]"

20   RCW 70.96A.020(17)(a). An offender also presents a likelihood of serious harm if the offender

21   "has threatened the physical safety of another and has a history of one or more violent acts."

22   RCW 70.96A.020(17)(b).

23

1    The version of DOC Policy 630.540 that was in effect at all times relevant to plaintiff's

2    complaint provides that the *emergency* administration of involuntary antipsychotic medication

3    may be ordered for a qualifying offender by a licensed physician, Advanced Registered Nurse

4    Practitioner, or Physician Assistant for a maximum of 72 hours, excluding weekends, without

5    conducting an Involuntary Antipsychotic Hearing (IAH). *Id.*, § II.A (emphasis added). In order

6    to administer involuntary antipsychotic medication on an emergency basis, medical staff must

7    determine (1) that the offender's condition constitutes an emergency because the offender is

8    suffering from a mental disorder; (2) that the offender presents an *imminent* likelihood of serious

9    harm to self or others, including failure to care for self if the harm is imminent; and (3) that the

10    offender is unlikely to respond to less restrictive medically acceptable alternatives or such

11    alternatives are not available or have not been successful. *Id.* (emphasis added).

12    If the use of force is required to administer the medication, then "[o]nly the amount of

13    force reasonably necessary to administer the medication will be used," the administration will be

14    video recorded, and DOC 21-424 Use of Force Report will be completed. *Id.*, § II.B. The

15    ordering practitioner will: (1) ensure monitoring occurs for adverse reactions and side effects; (2)

16    document the justification, and when and how the medication is to be administered in the

17    offenders health record; (3) notify the Health Authority/designee that the involuntary

18    antipsychotic medication was initiated. Administration of involuntary medication for more than

19    72 hours for a single emergency, excluding weekends and holidays, will require an IAH. *Id.*, §

20    II.D. *No more than 2 emergencies may be declared within any 30-day period. Id.* (emphasis

21    added).

22    DOC Policy 630.540 also sets forth the procedures for a 14 Day Involuntary

23    Antipsychotic Hearing (IAH). *Id.*, § III. The treating provider may request a 14 Day IAH from

the Director of Behavioral Health or his designee. *Id.*, § III.A.1. The IAH Committee includes a chairperson, a non-treating psychiatrist, and a non-treating psychologist. *Id.*, III.B.1. The treating provider prepares a report for the IAH Committee explaining the basis of the request, diagnosis, disturbed behavior and mental status, recommended antipsychotic(s), methods used to encourage voluntary adherence, voluntary and involuntary medication history, and a description of the less intrusive treatment alternatives considered or attempted. *Id.*, § III.C. The hearing is scheduled no later than 7 calendar days following the IAH Committee's appointment. *Id.*, § IV.A. The offender must receive written notice of the hearing at least 24 hours prior to the hearing and has the right to refuse involuntary medication/psychiatric care 24 hours prior to the hearing and until the hearing adjourns. *Id.*, § IV.B.1.

During the IAH, the offender has the right to attend and be heard, to present limited testimony through witnesses and to cross-examine witnesses called by the facility, to have a competent lay advisor present, and to be informed of the evidence relied upon for the proposed involuntary treatment. *Id.*, § V. After a presentation of the evidence, the IAH Committee makes its determination by a majority vote, although the non-treating psychiatrist must vote in favor of involuntary antipsychotic medication administration for it to be approved. *Id.*, § VII. The IAH Committee chairperson completes a hearing summary, which sets out the nature of the evidence relied upon and the reason for the decision. *Id.* The summary specifically states whether a mental illness was found and how the illness is related to endangerment of self, others, property, and/or grave disability. *Id.* The offender is then provided the hearing summary, a copy of the minutes, and the appeal procedure within 72 hours of the hearing, excluding weekends and holidays. *Id.* An offender may appeal the decision of the IAH Committee within 24 hours of receipt of the hearing summary. *Id.*, § X. The Director of Behavioral Health or his designee will review

1    the appeal to determine whether the required procedures were followed. *Id.* If the required

2    procedures were not followed, the Director of Behavioral Health will convene a new IAH using

3    the procedures and timeframes above. *Id.*

4    **B.    Plaintiff's Psychiatric History and Involuntary Administration of Medication**

5            Plaintiff was convicted of Second Degree Murder – Domestic Violence and entered DOC

6    custody in October 2014. Dkt. 21, Declaration of Dianna Rule ("Rule Decl."), Exh. 1 (Warrant

7    of Commitment). In support of their motion, defendants submit the "Involuntary Antipsychotic

8    Reports" prepared by plaintiff's treating mental health providers on February 6, 2018, and

9    February 7, 2018, by psychologist Arthur G. Davis, Ph.D. and psychiatric mental health nurse

10   practitioner (PMNHP) Calvin Cogburn. Dkt. 20, Symon Decl., Exh. 5 ("Involuntary

11   Antipsychotic Report" Dated Feb. 6, 2018, by Arthur G. Davis, Ph.D.), Exh. 6 ('Involuntary

12   Antipsychotic Report" Dated Feb. 7, 2018, by Calvin Cogburn, PMHNP). According to the

13   report authored by plaintiff's treating psychologist, Arthur G. Davis, at the time of the events

14   giving rise to plaintiff's claims, plaintiff had been consistently diagnosed by DOC mental health

15   providers as suffering from schizoaffective disorder-bipolar type. Dkt. 20, Symon Decl., Exh. 5.

16   The report states that, plaintiff had "a very long history of mental problems way before prison

17   being treated with similar class medications even in the military for psychosis and manic as well

18   as depressive disorder." *Id.* It further states that plaintiff was first placed on involuntary

19   medication on August 16, 2016 while housed at a different DOC facility and while in DOC

20   custody, "[plaintiff] was consistently placed on consecutive periods of 180 days involuntary

21   medications due to danger to self, others, destruction of property in juxtaposition with clear

22   evidence of severe mental illness." *Id.*

23

1    After plaintiff was transferred to the MCC, Dr. Davis' report indicates plaintiff's

2  involuntary medication order inadvertently expired, but plaintiff indicated he would continue his

3  medications voluntarily. *Id*. According to the report of plaintiff's treating psychiatric mental

4  health nurse practitioner (PMHNP) Calvin Cogburn, during July 2017, plaintiff stopped

5  voluntarily taking his antipsychotic medications and became "increasingly delusional (grandiose,

6  persecutory, and somatic)." *Id*. The report states plaintiff was transferred to the Close

7  Observation Area (COA) of the Special Offenders Unit (SOU) several times between July 2017

8  and early 2018 due to concerns regarding his delusional behavior causing disturbances in his

9  regular unit. *Id*.

10    PMNHP Cogburn's report further states that plaintiff's mental health history reflects a

11  number of suicide attempts "including jumping from a moving vehicle, hanging, suffocation, and

12  'suicide by cop' on the day of his arrest in 2015." *Id*. While in DOC custody at WSP, the reports

13  state that plaintiff also attempted to electrocute himself with hair clippers and attempted to

14  overdose on over the counter medications. *Id.*, Exhs. 5, 6. PMNHP Cogburn's report states that

15  plaintiff has received two serious infractions for strong-arming and threatening other offenders

16  and during "early 2018", plaintiff could not affirmatively state he would not attempt to murder

17  staff who were administering involuntary antipsychotic injections. *Id.*, Exh. 6. According to Dr.

18  Davis' report, plaintiff stated on more than one occasion, including on February 5, 2018, that he

19  had "[a]ttempted to kill Offender Garcia, and would like to be arrested and taken to King County

20  Jail." Dkt. 20, Symon Decl., Exh. 5.

21    Dr. Davis' report also states that when plaintiff stopped taking his medications he:

22  neglected activities of daily living such as bathing, eating, and sleeping; his hygiene became so

23  poor that medical providers occasionally found it "impossible to meet with him in a closed

REPORT AND RECOMMENDATION - 8

room"; he lost weight and had difficulty sleeping; he "complain[ed] of multiple somatic concerns, such as chest pain [and] brain damage; he became confused and delusional, seeing himself as a 'special ops' soldier and paranoid that gang members [were] after him because of the 'Intel work' that he does for law enforcement, demonstrating his psychosis"; he became confused about his identity to the extent he had difficulty determining "where he should be as well as being somewhat confused about why he is in prison." *Id.*, Ex. 5. PMNHP Cogburn's report also states that when off his medication plaintiff exhibited "pressured speech; flight of ideas, and other disorganized thinking, and respond[ed] to internal stimuli," which led to him creating "persistent disturbances on E unit day and night." *Id.*, Ex. 6.

Based on their clinical assessments both Dr. Davis and PMNHP Cogburn's reports conclude that plaintiff demonstrated signs of mental illness, was a danger to himself and others, and was gravely disabled. *Id.*, Exhs. 5, 6. The reports also state that plaintiff's prognosis is much better on medication. *Id.* Dr. Davis' report states that with medication plaintiff's prognosis is "good" and that he "appears nearly symptom free when [on] medication…maintains his hygiene, he is far less disturbed and distracted by delusions, he is able to participate in group therapies without the interference of psychotic mentation." *Id.*, Exh. 5. PMHNP Cogburn's report states that plaintiff's prognosis with medication is "fair" stating that there is some concern that "repeated and persistent manic episodes in the presence of past severe methamphetamine abuse has irreparably damaged his frontal lobe." *Id.*, Exh. 6. But the report also states that plaintiff's prognosis without medication is "poor" and that he "cannot manage successfully in any setting without appropriate psychotropic medication administration." *Id.*, Exh. 6.

On January 25, 2018, PMHNP Cogburn issued an emergency order directing that plaintiff receive injections of antipsychotic medication for each occasion when he refused to take the

medication orally. *Id.*, Exh. 2 ("Primary Encounter Report" by PMHNP Cogburn dated Jan. 25, 2018). *This was the first instance of involuntary medication during the period plaintiff identifies in his complaint. Id.* On February 1, 2018, PMHNP Cogburn entered a new emergency order for involuntary administration of medication. *Id.*, Exh. 3 ("Primary Encounter Report by PMHNP Cogburn dated Feb. 1, 2018). *This was the second instance of involuntary medication during the period plaintiff identifies in his complaint. Id.* In total, plaintiff received medication by intramuscular injection on January 25, January 28, January 29, February 1, February 2, February 3 and February 4, of 2018, under these two emergency orders. Dkt. 21, Rule Decl., Exh. 3.

On February 6, 2018, Dr. Davis began the process for 14 days of involuntary administration of antipsychotic medication for plaintiff on a non-emergency basis. *Id. On February 6, 2018, defendant Cogburn entered a third order for involuntary medication. Id.*, Exh. 4 ("Primary Encounter Report" dated Feb. 6, 2018 by Calvin Cogburn, PMHNP). Plaintiff was given involuntary injections pursuant to that order on February 6, February 7, February 8, February 10, and February 11, of 2018.[2] Dkt. 21, Rule Decl., Ex. 3.

On February 21, 2018, plaintiff was given 24 hours' notice of the administrative hearing and was informed that he could participate. Dkt. 20, Exh. 7. On February 22, 2018, plaintiff participated in an IAH for approval of 14 days of involuntary administration of antipsychotic medication. *Id.*, Exh. 8. The panel approved the involuntary administration of antipsychotic medication unanimously. *Id.*, Exh. 9. Plaintiff grieved this decision. Dkt. 21, Rule Decl., Exh. 2. In addition, plaintiff appealed the IAH decision. Dkt. 20, Symon Decl., Exh. 10. On March 5,

---

[2] The Court notes that defendants do not mention the February 11, 2018, injection in their declarations in support of the motion but the video evidence submitted reflects that an involuntary injection was in fact given on that date. Dkt. 21, Rule Decl., Ex. 3.

REPORT AND RECOMMENDATION - 10

1    2018, DOC denied plaintiff's appeal finding DOC followed its policy regarding the involuntary

2    administration of medication and plaintiff received all the process he was a due. *Id.*

3                                         **DISCUSSION**

4           To prevail on a Section 1983 claim, the plaintiff must establish (1) that he suffered a

5    violation of a right protected by the Constitution, and that (2) the violation was proximately

6    caused by a person acting under color of state law. *Crumpton v. Gates*, 847 F.2d 1418, 1420 (9th

7    Cir. 1991). To satisfy the second prong, the plaintiff must allege facts showing how individually

8    named defendants caused, or personally participated in causing, the harm alleged in the

9    complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

10          The Court shall grant summary judgment if the movant shows that there is no genuine

11   dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R.

12   Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence

13   of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d

14   1070, 1076 (9th Cir. 2001) (en banc). A genuine dispute concerning a material fact is presented

15   when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving

16   party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which

17   is "relevant to an element of a claim or defense and whose existence might affect the outcome of

18   the suit," and the materiality of which is "determined by the substantive law governing the

19   claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

20   1987). When the Court considers a motion for summary judgment, "[t]he evidence of the non-

21   movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.,* at

22   255. A nonmoving party's failure to comply with local rules in opposing a motion for summary

23

REPORT AND RECOMMENDATION - 11

1    judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to

2    judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

3         "If the moving party shows the absence of a genuine issue of material fact, the non-

4    moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

5    issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex*

6    *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The non-moving party may not rely upon mere

7    allegations or denials in the pleadings but must set forth specific facts showing that there exists a

8    genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). The

9    nonmoving party is required to present specific facts, and cannot rely on conclusory allegations.

10   *Hansen v. U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). A plaintiff must "produce at least some

11   significant probative evidence tending to support" the allegations in the complaint.  *Smolen v.*

12   *Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). The court must determine whether

13   the specific facts that are presented by the non-moving party, considered along with undisputed

14   context and background facts, would show that a rational or reasonable jury might return a

15   verdict in the non-moving party's favor based on that evidence. *Emeldi v. University of Oregon,*

16   698 F.3d 715, 728-29 (9th Cir. 2012).

17   **A.    Fourth Amendment**

18        Plaintiff's complaint alleges defendants' actions violated his Fourth Amendment rights.

19   Dkt. 4. Defendants move for summary judgment on this claim arguing that they are entitled to

20   qualified immunity because a Fourth Amendment right to be free from involuntary medication is

21   not clearly established, that to the extent plaintiff alleges defendants used excessive force and

22   failed to complete use of force reports the evidence shows no force was in fact used, and neither

23   defendant participated in the actual administration of the medication. Dkt. 19. In his reply,

1    plaintiff concedes there was no Fourth Amendment violation and indicates he was mistaken in

2    bringing that claim. Dkt. 25. The Court agrees that it appears plaintiff's claims are properly

3    analyzed under the Fourteenth and Eighth Amendments, as discussed below. In light of

4    plaintiff's concession, defendants' motion for summary judgment should be granted with respect

5    to plaintiff's Fourth Amendment claims and those claims should be dismissed with prejudice.

6    **B.    Fourteenth Amendment – Due Process**

7        Plaintiff argues defendants violated his Fourteenth Amendment Due Process rights by

8    forcing him to take antipsychotic medication involuntarily on an emergency basis more than

9    twice in less than thirty days in violation of DOC policy. Dkt. 4. Defendants contend that they

10   complied with DOC policy and afforded plaintiff all requisite due process. Dkt. 19. Defendants

11   also argue plaintiff's claims against defendant Schneeweiss should be dismissed because he did

12   not issue any of the involuntary medication orders in question. *Id.*

13       "The due process clause of the Fourteenth Amendment substantively protects a

14   person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical

15   treatment, and to receive sufficient information to exercise these rights intelligently." *Benson v.*

16   *Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citing *White v. Napoleon,* 897 F.2d 103, 111 (3rd

17   Cir. 1990)) (internal citations omitted). Specifically, inmates possess "a significant liberty

18   interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process

19   Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-222 (1990).

20   Substantive due process is satisfied, and a state may treat an inmate who has a serious mental

21   illness with involuntary psychotropic medication, if the inmate is dangerous to himself or others

22   and the treatment is in the inmate's medical interest. *Id.*, at 227. In the context of involuntary

23   medication, procedural due process is satisfied if the inmate is provided with notice, the right to

1   be present at an adversarial hearing, and the right to present and cross-examine witnesses. *Id.*, at

2   235. Appointment of counsel is not required because a lay advisor who understands the

3   psychiatric issues involved sufficiently protects an inmate's due process rights. *Id.* at 236. Such

4   procedural mechanisms adequately protect the Fourteenth Amendment rights of inmates, even

5   when the ultimate substantive decision to medicate is left to medical personnel and not the court.

6   *Id.*, at 231.

7        An inmate's liberty interests are "adequately protected, and perhaps better served, by

8   allowing the decision to medicate to be made by medical professionals rather than a judge."

9   *Washington*, 494 U.S. at 231.  By leaving the decision to medicate in the hands of an inmate's

10  mental health providers, the court is able to avoid "unnecessary intrusion into either medical or

11  correctional judgments." *Vitek v. Jones*, 445 U.S. 480, 496 (1980). The court gives "deference …

12  to medical professionals who have the full-time responsibility of caring for mentally ill inmates"

13  because those professionals "possess, as courts do not, the requisite knowledge and expertise to

14  determine whether [antipsychotics] should be used in an individual case." *Washington*, 494 at

15  230 n.12. Because "[t]he risks associated with antipsychotic drugs are for the most part medical

16  ones," the decision to medicate is "best assessed by medical professionals." *Id.* at 233.

17       In *Kulas v. Valdez*, 159 F.3d 453 (9th Cir. 1998), the Ninth Circuit inferred that the due

18  process procedural requirements described in *Washington v. Harper*, (494 U.S. 210, 221-222

19  (1990)) are not applicable when an emergency exists requiring the involuntary administration of

20  an antipsychotic medication. Citing the Fourth Circuit's opinion in *Hogan  v. Carter*, 85 F.3d

21  1113 (4th Cir. 1996) which found such an emergency exception, the Ninth Circuit noted that,

22  unlike in *Hogan*, "[t]here is no evidence that Kulas posed such an imminent and serious danger

23  to himself or others that the minimal procedural requirements of *Harper*-notice and right to be

present at and participate in a hearing-could not be met." *Kulas*, 159 F.3d at 456.

In *Hogan*, a doctor "personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from *imminent, self-inflicted harm*." *Hogan*, 85 F.3d at 1117 (citation omitted) (emphasis added). The Fourth Circuit reversed the district court's decision denying the doctor's motion to dismiss and remanded the matter with instructions to enter judgment for the defendant doctor. *Id.* at 1118. The Fourth Circuit commented:

> If Dr. Carter had not ordered the single dose of Thorazine that he did order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

*Id.* at 1118–19. In *Kulas*, the Ninth Circuit noted that, in contrast to *Hogan*, the inmate-patient was "merely loud and uncooperative." *Kulas*, 159 F.3d at 456. The Court determined that behavior by an inmate that was merely loud and uncooperative was insufficient to establish an emergency circumstance such that the minimal procedural due process requirements set forth in *Harper* could not be met. *Id.*

In his complaint, plaintiff contends his Due Process rights were violated because he was forced to take antipsychotic medication involuntarily on an emergency basis more than twice in less than thirty days between January 22, 2018 and February 13, 2018.[3] Dkt. 4. Defendants

---

[3] The Court notes that plaintiff's complaint does not specifically allege that the first two orders for emergency involuntary administrations of medication during the period from January 22, 2018 to February 13, 2018, violated his rights but argues his rights were violated by the additional (in excess of two) orders for emergency administrations of medication during that period. Dkt. 4.

REPORT AND RECOMMENDATION - 15

1    present evidence in support of their motion that three involuntary medication orders were issued

2    during the subject period, on January 25, 2018, February 1, 2018, and February 6, 2018, all by

3    PMHNP Cogburn.[4] Dkt. 20, Symon Decl., Exhs. 2, 3, 4, 5, 6.

4          Defendants argue that defendant Cogburn "only issued two emergency orders, followed

5    by an order in connection with an IAH" and that, therefore, they did not violate DOC policy

6    providing that no more than two emergency orders may be entered in a thirty-day period. Dkt.

7    19. The language of the DOC policy does not appear to the Court to support the defendants'

8    interpretation. As detailed above, DOC Policy 630.540 provides, in relevant part, that certain

9    medical providers may order *emergency* administration of involuntary antipsychotic medication

10   for up to 72 hours, excluding weekends and holidays, without an IAH if they determine the

11   offender suffers from a mental disorder, presents an *imminent* likelihood of serious harm to

12   others or self, and will not likely respond to less restrictive medically acceptable alternatives, or

13   such alternatives are unavailable or have not been successful. Dkt. 20, Symon Decl., Exh. 1

14   (emphasis added). The policy provides that "administration of involuntary medication for more

15   than 72 hours for a single emergency, excluding weekends and holidays, will require an [IAH]"

16   and "[n]o more than three emergency orders may be entered within a thirty-day period." *Id.*

17         Here, defendants acknowledge that three involuntary medication orders were entered

18   within a thirty-day period. Although the third order was entered the day after the request for the

19   IAH hearing was made, it was entered several weeks before plaintiff was given notice of the

20   hearing and the hearing was conducted. The Court sees nothing in DOC Policy 630.540 stating

21

22   _____

     [4] The Court notes that, in his complaint, plaintiff alleges four emergency orders were entered in thirty
23   days. Dkt. 4, at 3. However, in his response to defendants' motion, plaintiff offers no evidence of a fourth
     order during the period in question. Dkt. 25. Furthermore, plaintiff appears to concede that he may have
     been mistaken about the fourth order noting that "there were a minimum of three orders" entered within
     thirty days during the subject period. *Id.*, at 4.

REPORT AND RECOMMENDATION - 16

that as long as an IAH hearing has been requested defendants may either involuntarily medicate a prisoner on a non-emergency basis or may medicate them more than twice within thirty days on an emergency basis, before the IAH hearing is conducted. However, whether or not defendants' actions violated DOC policy, the question before the Court is whether defendants' actions violated plaintiff's Fourteenth Amendment Due Process rights.

### 1. Substantive Due Process

Defendants present substantial evidence that the requirements of substantive due process were met with respect to the third involuntary medication order. Specifically, defendants submit evidence in the form of Involuntary Antipsychotic Reports dated February 6, 2018 (the same day as the third involuntary medication order) and February 7, 2018, from plaintiff's treating psychiatric providers PMNHP Cogburn and Arthur G. Davis, Ph.D. Dkt. 20, Symon Decl., Exhs. 5, 6. These reports, prepared for purposes of the 14-day IAH, state that plaintiff had been consistently diagnosed with schizoaffective disorder-bipolar type and that when plaintiff had recently discontinued his medications he rapidly decompensated.

The reports state plaintiff began to show significant signs of mental illness including delusions of grandeur about being a "special ops" soldier and paranoia that gang members were after him because of the "intel work" he was doing for law enforcement, evidencing psychosis. The reports state plaintiff had become so decompensated without his medication that he had become confused about his identity, physical functioning, who he was, where he should be and why he was in prison. *Id.* The reports also note that plaintiff's medical records revealed a history of suicide attempts including trying to electrocute himself with hair clippers while at a different facility. They also note that plaintiff's delusions were replete with themes of violence, that he had been infracted for threatening in June 2017, and that he had, on one occasion, forced a

vulnerable low IQ fellow inmate to drink a liquid concoction which made that individual sick with cramps and diarrhea. The reports also note that plaintiff had reported, as recently as February 5, 2018, that he had "attempted to kill Offender Garcia, and would like to be arrested and taken to King County Jail."

The reports further state that plaintiff's hygiene had become extremely poor, that he had lost weight because he was concerned his food was being poisoned, and that his sleep had been significantly disrupted. Based on this history and these clinical assessments both Dr. Davis and PMNHP Cogburn's reports concluded that plaintiff demonstrated signs of mental illness, was a danger to himself and others and was gravely disabled. *Id.*, Exhs. 5, 6. The reports also state that plaintiff's psychiatric history showed plaintiff's prognosis was much better on medication and that his prognosis without medication was poor.

Plaintiff generally disputes the diagnosis of schizoaffective disorder-bipolar type and that he was, or is, psychotic. However, plaintiff does not specifically dispute that he exhibited the behaviors noted by his psychiatric providers in the Involuntary Antipsychotic Reports, nor does he present evidence to otherwise contradict these clinical observations and assessments. Plaintiff indicates he believes he was incorrectly diagnosed. In response to defendants' motion, plaintiff refers to his "current treatment plan" and attaches several documents including one entitled "Mental Health Treatment Plan" with a "start date" of July 31, 2019. Dkt. 25. This document does not include a diagnosis of schizoaffective disorder-bipolar type but reflects diagnoses of post-traumatic stress disorder, amphetamine-type stimulant use disorder, cocaine use disorder, opioid use disorder, cannabis use disorder, major neurocognitive disorder due to traumatic brain injury, with behavior disturbance (i.e., pseudobulbar affect), substance induced psychotic disorder, and attention deficit/hyperactivity disorder, combined presentation. *Id.* However,

nothing in this subsequent record states that plaintiff was previously misdiagnosed, nor does it

directly undermine any of the observations and clinical findings presented in Dr. Davis' and

PMHNP Cogburn's Involuntary Antipsychotic Reports. *Id.*

Even if plaintiff's diagnosis was later changed (based on additional or new clinical

information) to fit more closely with his psychiatric symptoms, this does not undermine the

evidence presented by defendants that, at the time of the third involuntary medication order on

February 6, 2018, plaintiff had a serious mental illness, that he was dangerous to himself and

others, and that medication significantly improved plaintiff's symptoms, and was in plaintiff's

medical interest. *See Washington.*, 494 U.S. at 227. Plaintiff fails to raise a genuine issue of

material fact on this issue. As such, the record shows defendants complied with the requirements

of substantive due process in issuing the third involuntary medication order, and defendants are

entitled to summary judgment on that claim.

## 2. Procedural Due Process

### a. Defendant Cogburn

The Court finds defendant Cogburn has failed to meet his burden on summary judgment

with respect to plaintiff's procedural due process claim. Procedural due process requires that, in

order for prison officials to administer antipsychotic medication involuntarily, an inmate must be

provided with notice, the right to be present at an adversarial hearing, and the right to present and

cross-examine witnesses. *Washington*, 494 U.S. at 235. The record here shows that when the

third order for involuntary medication was issued on February 6, 2018, the initial request for a

14-day IAH had been made but none of the *Harper* procedural requirements (notice and hearing)

had yet been met and, of course, the ultimate determination by the IAH Committee as to whether

involuntary medication was appropriate, had not yet been made.

The Ninth Circuit has inferred that an exception to these due process procedural requirements exists only in an emergency circumstance wherein an inmate "pose[s] such an imminent and serious danger to himself or others that the minimal procedural requirements of *Harper*-notice and right to be present at and participate in a hearing-[can]not be met." *Kulas*, 159 F.3d at 456. But here, defendants present no evidence, and in fact do not even argue, that the third involuntary medication order met this emergency exception standard. Defendants submit no evidence from PMHNP Cogburn, or any other provider, indicating that plaintiff was such an imminent and serious danger to himself or others that they were unable to comply with the *Harper* Due Process requirements before involuntarily medicating plaintiff. The record shows that two prior emergency involuntary medication orders were issued by defendant Cogburn on January 25, 2018, and February 1, 2018. But defendants present no evidence regarding the specific emergency circumstances supporting those orders either, or that a medical determination was made in issuing any of the involuntary medication orders that plaintiff was an *imminent* and serious danger to himself or others.[5][6]

Accordingly, defendant Cogburn has failed to meet his initial burden on his motion for summary judgment with respect to plaintiff's procedural due process claim. However, because it appears possible that defendants may be able to replead their motion and present additional facts and evidence to support summary judgment on plaintiff's procedural due process claim, the

---

[5] The Court notes that DOC policy requires that the provider issuing the emergency antipsychotic medication order "document the justification, and when and how the medication is to be administered in the offenders health record." Dkt. 20, Symon Decl., Exh. 1, § II.C.2. But defendants submit no evidence that such a justification was documented at the time nor do they submit a declaration from defendant Cogburn explaining the emergency basis for any of the three involuntary medication orders.

[6] Although plaintiff does not specifically challenge these first two orders, it appears to the Court that the circumstances under which the first two orders were issued may very well be relevant to the question of whether the third order was issued in accordance with procedural due process.

1   undersigned recommends that defendants' motion for summary judgment be denied without

2   prejudice to a subsequent appropriate summary judgment motion.[7]

3       **b. Defendant Schneeweiss**

4       Defendants argue defendant Schneeweiss should be granted summary judgment because

5   he did not issue any of the involuntary medication orders at issue. Plaintiff argues defendant

6   Schneeweiss was aware that he was being involuntarily medicated and, therefore, he is also

7   responsible for violating his rights.

8       A §1983 plaintiff must allege that a defendant's own conduct violated the plaintiff's civil

9   rights and cannot establish liability on the basis of supervisory responsibility alone. *See City of*

10  *Canton v. Harris*, 489 U.S. 378, 385-90 (1989); *Monell v. Dep't of Social Servs.*, 436 U.S. 658,

11  691-94 (1978). A plaintiff cannot hold an officer liable "because of his membership in a group

12  without a showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297

13  F.3d 930, 935 (9th Cir.2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).

14      Plaintiff provides no facts or evidence from which it may be concluded that defendant

15  Schneeweiss was involved in any way in the alleged violation of plaintiff's procedural due

16  process rights. Plaintiff presents no evidence that defendant Schneeweiss was involved in the

17  decision to issue any of the involuntary medication orders in question. The record reflects

18  defendant Schneeweiss was a "non-treating psychiatrist" on the IAH Committee which, after a

19  hearing, approved 14-days of involuntary medication for plaintiff. Dkt. 21, Exhs. 8, 9. But the

20  fact that defendant Schneeweiss may have been aware that plaintiff had been involuntarily

21  medicated does not mean he was aware of or bore any responsibility for any alleged due process

22

23

---

[7] The Court notes that this should not be interpreted by defendants as an invitation to file another summary judgment motion containing the same arguments and evidence.

violation with respect to the third (February 6, 2018) involuntary medication order. Plaintiff fails to present any evidence to indicate defendant Schneeweiss' personally participated in the alleged due process violation. Accordingly, the undersigned recommends that defendant Schneeweiss' motion for summary judgment be granted with respect to plaintiff's procedural due process claim.

## C.     Eighth Amendment – Cruel and Unusual Punishment

### 1.     Deliberate Indifference to a Serious Medical Need

Plaintiff also raises an Eighth Amendment claim that defendants subjected him to cruel and unusual punishment by forcing him to take medication that was dangerous to his health.

To establish an Eighth Amendment violation related to medical care, an inmate must prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010). Prison officials may be deemed to have been deliberately indifferent to an inmate's serious medical needs "when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoted sources and internal quotation marks omitted). However, a prison official may be held liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting *Estelle*, 429 U.S. at 104), *overruled on other grounds by WMX Techs. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

1    The indifference to medical needs must be substantial; a constitutional violation is not

2   established by negligence or "an inadvertent failure to provide adequate medical care." *Estelle*,

3   429 U.S. at 105-06; *Anthony v. Dowdle*, 853 F.2d 741, 743 (9th Cir. 1988). Nor does a difference

4   of opinion between an inmate and medical authorities regarding proper medical treatment give

5   rise to a § 1983 claim. *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir.

6   1981). An inmate must show the course of treatment chosen "'was medically unacceptable under

7   the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive

8   risk to plaintiff's health.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057-58 (9th Cir. 2004) (quoting

9   *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)).

10    Here, plaintiff has not alleged any facts to show that defendants were deliberately

11   indifferent to his medical needs; instead, the evidence reflects that plaintiff disagrees with his

12   providers about his treatment. This difference of opinion is not deliberate indifference. *Toguchi*

13   *v. Chong*, 391 F.3d 1051, 1058 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.

14   1989). Plaintiff indicates he is generally concerned about the side effects of the antipsychotic

15   medications but presents no medical evidence that he in fact has suffered any serious mental or

16   physical side effects or harm as a result of the antipsychotic medication. Plaintiff also presents no

17   evidence that defendants were aware that the administration of antipsychotic medication would

18   endanger plaintiff's health or that they ignored a serious medical need in administering the

19   antipsychotic medication.

20    Rather, the evidence shows that defendants reasonably believed, based on their clinical

21   assessments and plaintiff's medical records, that plaintiff suffered from a severe mental illness

22   causing psychosis and that the administration of antipsychotic medication was medically

23   necessary and would aid plaintiff in managing his mental illness. As noted above, even if

REPORT AND RECOMMENDATION - 23

1    plaintiff's psychiatric diagnosis was later changed to fit more closely with his psychiatric

2    symptoms, (or because a different mental health provider had a different opinion) this does not

3    demonstrate deliberate indifference on the part of the defendants. Rather, the record shows that,

4    at the time of the third involuntary medication order on February 6, 2018, defendants' intent in

5    medicating plaintiff was to aid him in managing his psychiatric symptoms in order to improve

6    his health and safety.

7        In sum, the record shows defendants were not deliberately indifferent to plaintiff's

8    serious medical need and plaintiff fails to raise a genuine issue of material fact with respect to

9    this claim. Accordingly, defendants' motion for summary judgment should be granted on this

10   claim.

11              **2.  Excessive Force**

12       Plaintiff's complaint also raises conclusory allegations of "excessive force." Dkt. 4. It is

13   unclear whether plaintiff intends to raise this as a separate claim under the Eighth Amendment.

14   However, to the extent he does, as discussed below, the undisputed record shows no excessive

15   force was used in administering plaintiff's medication.

16       The unnecessary and wanton infliction of pain violates the cruel and unusual punishments

17   clause of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). For claims

18   alleging the use of excessive physical force, the issue is "'whether force was applied in a good-

19   faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"

20   *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quoting *Hudson*, 503 U.S. at 7). The

21   objective component of an Eighth Amendment claim is contextual and responsive to

22   contemporary standards of decency. *Hudson*, 503 U.S. at 8. Although de minimis uses of force

23   do not violate the Constitution, the malicious and sadistic use of force to cause harm always

1    violates contemporary standards of decency, regardless of whether or not significant injury is

2    evident. *Wilkins*, 559 U.S. at 37-38 (citing *Hudson*, 503 U.S. at 9-10); *Pitts v. Tuitama*, No. CV

3    17-00137 JMS-KSC, 2017 WL 1731681, at *4 (D. Haw. May 2, 2017).

4         Here, defendants present evidence in the form of video recordings of the administration

5    of antipsychotic medication to plaintiff during the period in question. The recordings reflect that

6    plaintiff did not physically resist the administration of the medication and no excessive force was

7    used by prison staff in administering the medication to plaintiff.[8] Plaintiff does not specifically

8    dispute defendants' evidence but appears to argue only that because he claims the administration

9    was involuntary and in violation of DOC policy and his Due Process rights, by extension

10   defendants actions in involuntarily medicating him constituted excessive force. But the

11   undisputed record shows that, to the extent any force could be considered to have been used, it

12   was *de minimus* and was not employed maliciously and sadistically to cause harm. Rather, the

13   record shows that antipsychotic medication was administered because defendants believed it was

14   medically necessary and in plaintiff's best interests. Plaintiff fails to raise an issue of fact as to

15   whether excessive force was used in administering the medication during the period in question.

16   Accordingly, defendants' motion for summary judgment should be granted with respect to

17   plaintiff's Eighth Amendment excessive force claim.

18   **D.    State Law Claims – Assault and Battery**

19        Washington law defines the tort of assault as the use or threatened immediate use of force

20   that causes reasonable apprehension of harm. *Brower v. Ackerley*, 88 Wash.App. 87, 943 P.2d

21   1141, 1144–45 (Wash. Ct. App. 1997). Battery is defined as an intentional tort, requiring the

22

23

---

[8] The Court notes that it appears that while defendant Cogburn ordered the administration of the medication, neither defendant personally participated in administering the medication to plaintiff themselves.

REPORT AND RECOMMENDATION - 25

tortfeasor to intend a harmful touching and requiring the plaintiff to show that there was no

consent to the touching. *Garratt v. Dailey,* 46 Wash.2d 197, 279 P.2d 1091, 1093 (1955).

However, because of the unique relationship between plaintiff and defendants in this case, the

Court must also examine whether the alleged force used was excessive. "Washington courts have

long recognized a jailer's special relationship with inmates, particularly the duty to ensure health,

welfare, and safety." *Gregoire v. City of Oak Harbor*, 170 Wash. 2d 628, 635 (2010); *see* RCW

§ 70.48.071 (correctional facilities must have standards necessary to meet federal and state

constitutional requirements relating to health, safety, and welfare of inmates and staff).

Under Washington law, force used by a public officer is not unlawful "[w]henever

necessarily used ... in the performance of a legal duty." *Brooks v. City of Seattle*, 599 F.3d 1018,

1031 (9th Cir. 2010) (citing RCW 9A.16.020(1)). Excessive force is force beyond that which is

"objectively reasonable." *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 567 (Div. II

2000). Thus, if there are no genuine issues of material fact regarding whether the force used in

this case was necessary to protect the health, safety, and welfare of plaintiff or other inmates and

staff, defendants are entitled to summary judgment. *See e.g. Mancini v. City of Tacoma*, 188

Wash. App. 1006 (2015) (internal quotations omitted) (an officer making an arrest is justified in

using sufficient force to subdue a prisoner; however, "an officer becomes a tortfeasor and is

liable as such for assault and battery if unnecessary violence or excessive force is used in

accomplishing the arrest").

Here, defendants video evidence reflects that plaintiff did not physically resist the

administration of the medication and, while plaintiff was handcuffed for the extraction from his

cell, no excessive physical force was used by prison staff in administering the medication to

REPORT AND RECOMMENDATION - 26

plaintiff.[9] Plaintiff does not specifically dispute defendants' evidence but appears to argue only that because he claims the administration was involuntary and in violation of DOC policy and his Due Process rights, by extension defendants actions in involuntarily medicating him constituted assault and battery. But the question of whether plaintiff was afforded the proper procedural protections is a separate inquiry from whether defendants used excessive force in administering the medication and are thereby liable for assault and battery.

Here, the undisputed record shows that, to the extent any "force" could be considered to have been used in administering the medication, it was objectively reasonable under the circumstances. The video evidence shows plaintiff did not physically resist administration of the medication and that prison staff made only such physical contact as was necessary to administer the medication.

Furthermore, even evaluating the administration of the medication on its own as a "use of force", as discussed above, the record shows that antipsychotic medication was administered pursuant to the third involuntary medication order (issued February 6, 2018) because the medical evidence available at the time showed plaintiff was dangerous to himself and others, was gravely disabled, that medication was medically necessary, and in plaintiff's best interests. Defendants had a duty to ensure the health, welfare, and safety of plaintiff, other inmates and staff. The record shows their actions were "necessarily used ... in the performance of a legal duty" and were objectively reasonable under the circumstances. The question of whether defendants complied with the procedural requirements of Due Process in administering the medication pursuant to the third involuntary medication order prior to conducting an IAH hearing is a

---

[9] The Court notes that evidence indicates that while defendant Cogburn ordered the administration of the medication, neither defendant personally participated in administering the medication to plaintiff themselves.

REPORT AND RECOMMENDATION - 27

1    separate issue. Plaintiff fails to raise an issue of fact as to whether defendants used excessive

2    force in medicating plaintiff pursuant to the third involuntary medication order. Accordingly,

3    defendants' motion for summary judgment should be granted with respect to plaintiff's state law

4    assault and battery claims.

5    **E.    Qualified Immunity**

6           Defendants argue that they are entitled to qualified immunity from damages. Unless

7    plaintiff makes a two-part showing, qualified immunity shields government officials from

8    liability. The plaintiff must show both: the official(s) violated a federal statutory or constitutional

9    right, and -- at the time of the alleged act or failure to act there was clearly established law that

10   defined the contours of the federal right objectively putting the official(s) on notice – i.e., every

11   reasonable official would understand that what they are doing is unlawful. *Escondido v.*

12   *Emmons*, 139 S.Ct. 500 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

13          When qualified immunity is reviewed in the context of a defense motion for summary

14   judgment, the evidence must be considered in the light most favorable to the plaintiff with

15   respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam). If there is a

16   genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable

17   officer that their conduct was unlawful under the circumstances they confronted, and (2)

18   Whether the defendant's conduct violated a constitutional right" then summary judgment

19   granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston,* 883 F.3d 865, 871-

20   72 (9th Cir. 2018).

21          To determine whether there was clearly established law, the Court has stated, "[w]hile

22   there does not have to be a case directly on point, existing precedent must place the lawfulness of

23   the particular [action] beyond debate"; and the Court has also observed, "there can be the rare

1    obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though

2    existing precedent does not address similar circumstances." *Wesby,* 138 S.Ct. at 590. A clearly

3    established right exists if "controlling authority or a robust consensus of cases of persuasive

4    authority" have held, on facts that are close or analogous to the current case, that such a right

5    exists. *Hines v. Youseff,* 914 F.3d 1218, 1229 (9th Cir. 2019).

6         With respect to plaintiff's Fourth, Eighth and Fourteenth Amendment substantive Due

7    Process claims as well as plaintiff's his procedural Due Process claim against defendant

8    Schneeweiss, after viewing the facts in the light most favorable to plaintiff, the Court has found

9    that defendants are entitled to summary judgment on the merits of these claims. Therefore, the

10   Court need not further address the issue of qualified immunity with respect to these claims.

11        With respect to plaintiff's Fourteenth Amendment procedural Due Process claim against

12   defendant Cogburn, the Court has already determined that defendant failed to establish the

13   absence of genuine issues of material fact concerning whether plaintiff's procedural Due Process

14   rights were violated by the involuntary administration of antipsychotic medication. Thus,

15   defendants are not entitled to qualified immunity under the first prong of the qualified immunity

16   test.

17        Defendants make no specific arguments with respect to the second prong of qualified

18   immunity – i.e. that the constitutional right in question was not clearly established at the time.

19   The Court declines to address arguments defendants have not specifically raised themselves.

20   However, the Court does note that it was clearly established at the time of the events giving rise

21   to plaintiff's claims that in the context of involuntary medication, procedural due process

22   requires that an inmate be provided with notice, the right to be present at an adversarial hearing,

23   and the right to present and cross-examine witnesses. *Washington,* 494 U.S. at 235. Moreover,

1   although it appears the Ninth Circuit has only inferred the emergency exception to the due

2   process procedural requirements as the law of the Circuit, the law was clear enough at the time to

3   state that, to be involuntarily medicated under an emergency exception, an inmate must pose

4   such an "imminent and serious danger to himself or others that the minimal procedural

5   requirements of *Harper*-notice and right to be present at and participate in a hearing-could not be

6   met." *Kulas*, 159 F.3d at 456.

7        As defendants have not argued or presented facts demonstrating what, if any, emergency

8   circumstances existed supporting the third involuntary medication order, defendant Cogburn has

9   failed to establish he is entitled to qualified immunity on plaintiff's Fourteenth Amendment

10  procedural Due Process claim. Accordingly, the Court recommends plaintiff's motion for

11  summary judgment on qualified immunity grounds be denied without prejudice with respect to

12  plaintiff's Fourteenth Amendment procedural Due Process claim against defendant Cogburn.

13  **F.    Retaliation and Classification Decisions**

14       Plaintiff also alleges he was improperly placed at custody level I by "CMHC" Christine

15  Pratt and was "purposefully misdiagnosed" and forced to take medication "to cover for a level 3

16  grievance against Dr. Daniel Varnell at Washington State Penitentiary." In his response to

17  defendants' motion plaintiff also states that there was no self-harm, harm to others or thoughts of

18  either on January 18, 2018 or January 19, 2018 when he was transferred to the COA – this

19  allegation appears to relate to his complaints about his custody level. But plaintiff does not

20  identify either Ms. Pratt or Dr. Varnell as a defendant in this action and fails to link any of these

21  vague allegations to either of the named defendants. Accordingly, to the extent plaintiff intends

22

23

REPORT AND RECOMMENDATION - 30

to raise these claims against the named defendants, these claims should also be dismissed

without prejudice for failure to state a claim.[10] *See* 28 U.S.C. § 1915A.

## CONCLUSION

The Court recommends that defendants' motion for summary judgment (Dkt. 19) be

GRANTED IN PART and DENIED IN PART. Specifically, the undersigned recommends that

the motion be GRANTED in its entirety with respect to defendant Schneeweiss and all claims

against him be dismissed. With respect to defendant Cogburn, the undersigned recommends the

motion be GRANTED with respect to plaintiff's Fourth Amendment, Eighth Amendment,

Fourteenth Amendment substantive Due Process claims, and state law assault and battery claims

and DENIED WITHOUT PREJUDICE with respect to plaintiff's Fourteenth Amendment

procedural Due Process claim. The undersigned recommends that to the extent plaintiff intends

to raise retaliation claims against the named defendants based on his classification as custody

level I, these claims should be dismissed without prejudice for failure to state a claim. *See* 28

U.S.C. § 1915A. The undersigned recommends that defendants' request that plaintiff be assessed

a "strike" under 28 U.S.C. 1915(g) be denied. Plaintiff's remaining claims should be referred

back to Hon. Brian A. Tsuchida for further proceedings.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of

appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

assigned District Judge enters a judgment in the case.

---

[10] The Court notes that this dismissal does not bar any potential claims plaintiff might attempt to bring in a separate action against Ms. Pratt or Dr. Varnell. However, the Court does note that generally, a prisoner does not have a constitutionally protected liberty interest in a particular classification status, *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett*, 429 U.S. 78 (1976)), and that conclusory allegations of retaliation are insufficient to state a claim.

REPORT AND RECOMMENDATION - 31

1    Objections, however, may be filed and served upon all parties no later than **July 8, 2020.**

2    The Clerk should note the matter for **July 10, 2020**, as ready for the District Judge's

3    consideration if no objection is filed.  If objections are filed, any response is due within 14 days

4    after being served with the objections.  A party filing an objection must note the matter for the

5    Court's consideration 14 days from the date the objection is filed and served.  The matter will

6    then be ready for the Court's consideration on the date the response is due.  Objections and

7    responses shall not exceed **eight (8)** pages.  The failure to timely object may affect the right to

8    appeal.

9    DATED this 24th day of June, 2020.

10

11    _____

12    BRIAN A. TSUCHIDA
      United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 32