UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JASON MARK HART,

                Plaintiff,

    v.

CALVIN COGBURN,

                Defendant.

CASE NO. C19-01193-RAJ-BAT

**REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, Jason Mark Hart, proceeds pro se in this civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 4. Plaintiff is a prisoner currently housed at the Monroe Correctional Complex - Special Offenders Unit (MCC-SOU) in Monroe, Washington. *Id.* Before the Court is the only remaining defendant Calvin Cogburn's motion for partial summary judgment (Dkt. 50) seeking dismissal of plaintiff's sole remaining claim: that defendant violated plaintiff's right to procedural due process in involuntarily administering antipsychotic medication. For the reasons below, the undersigned recommends that defendant's motion (Dkt. 50) be DENIED.

**PROCEDURAL HISTORY**

      In July 2019, plaintiff filed a pro se prisoner civil rights action under 42 U.S.C. § 1983 against defendants Calvin Cogburn, PMHNP (psychiatric mental health nurse practitioner) and Dr. Dan Schneeweiss, both medical personnel at MCC and Department of Corrections (DOC)

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 1

1  employees. Dkt. 4. Plaintiff's complaint alleged that defendants violated his rights by ordering

2  the involuntary administration of antipsychotic medication during January and February of 2018.

3  *Id.* Specifically, he alleged that from approximately January 22, 2018 to February 13, 2018, he

4  was involuntarily forced to take antipsychotic medication on an emergency basis more than

5  twice in less than thirty days in violation of Department of Corrections (DOC) policy. *Id.*

6  Plaintiff also alleged he was improperly placed at custody level I and was "purposefully

7  misdiagnosed" and forced to take medication "to cover for a level 3 grievance against Dr. Daniel

8  Varnell at Washington State Penitentiary." *Id.* He alleged defendants used excessive force and

9  failed to complete use of force reports for each of the injections. *Id.* Plaintiff alleged the

10 antipsychotic medications caused "chest pain, hardening of heart and kidneys, as well as liver"

11 and that it "may have contributed to my major neurocognitive disorder, shortening attention

12 span, further lead to memory deficits" and that administration of the medication caused him

13 "mental anguish and psychological distress." *Id.*

14 Plaintiff's complaint alleged defendants' actions violated his Fourth, Eighth, and

15 Fourteenth Amendment (Due Process) rights under the United States Constitution and

16 constituted assault and battery under Washington state law. *Id.* Plaintiff sought injunctive relief

17 in the form of additional training to all DOC corrections officers and sergeants on DOC's policy

18 for the involuntary administration of antipsychotic medication. *Id.* He also requested

19 $19,000,000.00 in monetary damages. *Id.*

20 On March 11, 2020, defendants filed a motion for summary judgment seeking dismissal

21 of all claims. Dkt. 19. On October 19, 2020, the Honorable Richard A. Jones adopted the

22 undersigned's report and recommendation (Dkt. 43) and partially granted defendants' motion for

23 summary judgment (Dkt. 19) ordering: (1) all claims against defendant Dan Schneeweiss are

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 2

dismissed; (2) all Fourth Amendment, Eighth Amendment, Fourteenth Amendment substantive Due Process claims, and state law assault and battery claims are dismissed; and (3) all claims against defendants Schneeweiss and Cogburn based upon classification as custody level I are dismissed without prejudice for failure to state a claim. Dkt. 41. Defendant Cogburn's motion seeking summary judgment and dismissal of the procedural due process claim against him was denied without prejudice as was defendants' request that plaintiff be assessed a strike under 28 U.S.C. § 1915(g). *Id.*

On January 21, 2021, defendant Cogburn filed the instant motion for partial summary judgment seeking dismissal of the remaining procedural due process claim against him. Dkt. 50. Plaintiff filed a response to the motion and a supplemental response[1] and defendant filed a reply.[2] Dkts. 52, 56, 64.

**EVIDENCE RELIED UPON**

Defendant relies upon the same evidence submitted in support of the previous motion for summary judgment to support the instant motion. Dkt. 50. The Court previously summarized that evidence as follows:

> [D]eclaration of DOC Administrative Assistant Dianna Rule; declaration of DOC Health Services Manager, Rachael Symon; DOC Policy 620.540 (Involuntary Antipsychotic Administration), Revision Date December 24, 2015; Primary Encounter Reports by Calvin Cogburn, PMHNP, dated January 25, 2018, February 1, 2018, and February 6, 2018; Involuntary Antipsychotic Report dated February 6, 2018, by Arthur G. Davis, Ph.D.; Involuntary Antipsychotic Report dated February 7, 2018, by Calvin Cogburn, PMHNP; Notice of Involuntary Antipsychotic Hearing (24 hour) dated February 22, 2018; 14 Day Antipsychotic Hearing Minutes; Decision of Involuntary Antipsychotic Hearing Committee; Superior Court Cause No. 13-1-01982-6 Warrant of Commitment;

---

[1] The Court notes that in the supplement to his response plaintiff requests additional discovery. Dkt. 56. To the extent plaintiff is arguing he requires additional discovery in order to properly oppose defendants' motion for summary judgment, the Court does not reach the issue because it recommends denying defendant's motion.

[2] The Court notes that plaintiff also submitted a surreply (Dkt. 65) which was not specifically directed or authorized by the Court. However, whether the surreply is considered or not does not affect the Court's recommendation here.

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 3

Grievances Log I.D. Number 1865077 dated February 22, 2018, February 23, 2018, and March 1, 2018; video evidence of the involuntary administration of antipsychotic medication on January 25, 28, and 29, 2018 and February 1, 2, 3, 4, 6, 7, 8, 10, and 11, 2018. Dkts. 20, 21, 22, 33.[3]

Dkt. 34. Defendant also relies upon the briefing related to the prior motion for summary judgment (Dkts. 19, 25-0, 25-1, 25-2, 26, 27) the report and recommendation (Dkt. 34) and order issued (Dkt. 41) on the prior motion for summary judgment, and the other pleadings on file. Dkt. 50. Defendant did not submit any new or additional evidence in support of the instant motion for summary judgment. *Id.*

# STATEMENT OF MATERIAL FACTS

Because defendant relied upon the same evidence in his previous motion for summary judgment as in the instant motion, the material facts that were relevant to that motion, as related to the procedural due process claim against defendant Cogburn, remain relevant here. In its report and recommendation addressing defendants' prior summary judgment motion, the Court summarized the relevant material facts as follows:

> **A.    DOC Policy 630.540 (Involuntary Antipsychotic Administration)**
> Department of Corrections Policy 630.540 (Involuntary Antipsychotic Administration), establishes DOC's procedures for the involuntary administration of antipsychotic medication to an offender suffering from a mental disorder who, as a result of the mental disorder, is gravely disabled or presents a likelihood of serious harm to self, others, or property, as defined in RCW 70.96A.020. Dkt. 20, Declaration of Rachel Symon ("Symon Decl."), Exh. 1 (DOC Policy 630.540). Under the version of RCW 70.96A.020 in effect at the time, an offender is considered "gravely disabled" if the offender is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" or if the offender "manifests severe deterioration in routine functioning evidenced by a repeated and escalating loss of cognition or volitional control over his or her actions and is not receiving care as essential for his or her health or safety." RCW 70.96A.020(11).
> Further, an offender presents a "likelihood of serious harm" if there is "a substantial risk that: (i) Physical harm will be inflicted by an individual upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical

---

[3] "The Court notes that the first copy of the CD submitted by defendants was not viewable in its entirety and the Court directed defendants to submit a new copy of the CD. *See* Dkt. 28. The Court further notes that plaintiff also submitted a copy of a CD containing the same video evidence as submitted by defendants. Dkt. 32." Dkt. 34, Fn. 1.

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 4

harm on one's self; (ii) physical harm will be inflicted by an individual upon another, as evidenced by behavior that has caused the harm or that places another person or persons in reasonable fear of sustaining the harm; or (iii) physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior that has caused substantial loss or damage to the property of others[.]" RCW 70.96A.020(17)(a). An offender also presents a likelihood of serious harm if the offender "has threatened the physical safety of another and has a history of one or more violent acts." RCW 70.96A.020(17)(b).

The version of DOC Policy 630.540 that was in effect at all times relevant to plaintiff's complaint provides that the *emergency* administration of involuntary antipsychotic medication may be ordered for a qualifying offender by a licensed physician, Advanced Registered Nurse Practitioner, or Physician Assistant for a maximum of 72 hours, excluding weekends, without conducting an Involuntary Antipsychotic Hearing (IAH). *Id.*, § II.A (emphasis added). In order to administer involuntary antipsychotic medication on an emergency basis, medical staff must determine (1) that the offender's condition constitutes an emergency because the offender is suffering from a mental disorder; (2) that the offender presents an *imminent* likelihood of serious harm to self or others, including failure to care for self if the harm is imminent; and (3) that the offender is unlikely to respond to less restrictive medically acceptable alternatives or such alternatives are not available or have not been successful. *Id.* (emphasis added).

If the use of force is required to administer the medication, then "[o]nly the amount of force reasonably necessary to administer the medication will be used," the administration will be video recorded, and DOC 21-424 Use of Force Report will be completed. *Id.*, § II.B. The ordering practitioner will: (1) ensure monitoring occurs for adverse reactions and side effects; (2) document the justification, and when and how the medication is to be administered in the offenders health record; (3) notify the Health Authority/designee that the involuntary antipsychotic medication was initiated. Administration of involuntary medication for more than 72 hours for a single emergency, excluding weekends and holidays, will require an IAH. *Id.*, § II.D. *No more than 2 emergencies may be declared within any 30-day period. Id.* (emphasis added).

DOC Policy 630.540 also sets forth the procedures for a 14 Day Involuntary Antipsychotic Hearing (IAH). *Id.*, § III. The treating provider may request a 14 Day IAH from the Director of Behavioral Health or his designee. *Id.*, § III.A.1. The IAH Committee includes a chairperson, a non-treating psychiatrist, and a non-treating psychologist. *Id.*, III.B.1. The treating provider prepares a report for the IAH Committee explaining the basis of the request, diagnosis, disturbed behavior and mental status, recommended antipsychotic(s), methods used to encourage voluntary adherence, voluntary and involuntary medication history, and a description of the less intrusive treatment alternatives considered or attempted. *Id.*, § III.C. The hearing is scheduled no later than 7 calendar days following the IAH Committee's appointment. *Id.*, § IV.A. The offender must receive written notice of the hearing at least 24 hours prior to the hearing and has the right to refuse involuntary medication/psychiatric care 24 hours prior to the hearing and until the hearing adjourns. *Id.*, § IV.B.1.

During the IAH, the offender has the right to attend and be heard, to present limited testimony through witnesses and to cross-examine witnesses called by the facility, to have a competent lay advisor present, and to be informed of the evidence relied upon for the proposed involuntary treatment. *Id.*, § V. After a presentation of the evidence, the IAH Committee makes its determination by a majority vote, although the non-treating psychiatrist must vote in favor of involuntary antipsychotic medication administration for it to be approved. *Id.*, § VII. The IAH Committee chairperson completes a hearing

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 5

summary, which sets out the nature of the evidence relied upon and the reason for the decision. *Id*. The summary specifically states whether a mental illness was found and how the illness is related to endangerment of self, others, property, and/or grave disability. *Id*. The offender is then provided the hearing summary, a copy of the minutes, and the appeal procedure within 72 hours of the hearing, excluding weekends and holidays. *Id*. An offender may appeal the decision of the IAH Committee within 24 hours of receipt of the hearing summary. *Id.*, § X. The Director of Behavioral Health or his designee will review the appeal to determine whether the required procedures were followed. *Id.* If the required procedures were not followed, the Director of Behavioral Health will convene a new IAH using the procedures and timeframes above. *Id*.

### B.     Plaintiff's Psychiatric History and Involuntary Administration of Medication

Plaintiff was convicted of Second Degree Murder – Domestic Violence and entered DOC custody in October 2014. Dkt. 21, Declaration of Dianna Rule ("Rule Decl."), Exh. 1 (Warrant of Commitment). In support of their motion, defendants submit the "Involuntary Antipsychotic Reports" prepared by plaintiff's treating mental health providers on February 6, 2018, and February 7, 2018, by psychologist Arthur G. Davis, Ph.D. and psychiatric mental health nurse practitioner (PMNHP) Calvin Cogburn. Dkt. 20, Symon Decl., Exh. 5 ("Involuntary Antipsychotic Report" Dated Feb. 6, 2018, by Arthur G. Davis, Ph.D.), Exh. 6 ('Involuntary Antipsychotic Report" Dated Feb. 7, 2018, by Calvin Cogburn, PMHNP). According to the report authored by plaintiff's treating psychologist, Arthur G. Davis, at the time of the events giving rise to plaintiff's claims, plaintiff had been consistently diagnosed by DOC mental health providers as suffering from schizoaffective disorder-bipolar type. Dkt. 20, Symon Decl., Exh. 5. The report states that, plaintiff had "a very long history of mental problems way before prison being treated with similar class medications even in the military for psychosis and manic as well as depressive disorder." *Id.* It further states that plaintiff was first placed on involuntary medication on August 16, 2016 while housed at a different DOC facility and while in DOC custody, "[plaintiff] was consistently placed on consecutive periods of 180 days involuntary medications due to danger to self, others, destruction of property in juxtaposition with clear evidence of severe mental illness." *Id*.

After plaintiff was transferred to the MCC, Dr. Davis' report indicates plaintiff's involuntary medication order inadvertently expired, but plaintiff indicated he would continue his medications voluntarily. *Id*. According to the report of plaintiff's treating psychiatric mental health nurse practitioner (PMHNP) Calvin Cogburn, during July 2017, plaintiff stopped voluntarily taking his antipsychotic medications and became "increasingly delusional (grandiose, persecutory, and somatic)." *Id*. The report states plaintiff was transferred to the Close Observation Area (COA) of the Special Offenders Unit (SOU) several times between July 2017 and early 2018 due to concerns regarding his delusional behavior causing disturbances in his regular unit. *Id.*

PMNHP Cogburn's report further states that plaintiff's mental health history reflects a number of suicide attempts "including jumping from a moving vehicle, hanging, suffocation, and 'suicide by cop' on the day of his arrest in 2015." *Id*. While in DOC custody at WSP, the reports state that plaintiff also attempted to electrocute himself with hair clippers and attempted to overdose on over the counter medications. *Id.*, Exhs. 5, 6. PMNHP Cogburn's report states that plaintiff has received two serious infractions for strong-arming and threatening other offenders and during "early 2018", plaintiff could not affirmatively state he would not attempt to murder staff who were administering involuntary antipsychotic injections. *Id.*, Exh. 6. According to Dr. Davis' report, plaintiff stated on more than one occasion, including on February 5, 2018, that he had

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 6

"[a]ttempted to kill Offender Garcia, and would like to be arrested and taken to King County Jail." Dkt. 20, Symon Decl., Exh. 5.

Dr. Davis' report also states that when plaintiff stopped taking his medications he: neglected activities of daily living such as bathing, eating, and sleeping; his hygiene became so poor that medical providers occasionally found it "impossible to meet with him in a closed room"; he lost weight and had difficulty sleeping; he "complain[ed] of multiple somatic concerns, such as chest pain [and] brain damage; he became confused and delusional, seeing himself as a 'special ops' soldier and paranoid that gang members [were] after him because of the 'Intel work' that he does for law enforcement, demonstrating his psychosis"; he became confused about his identity to the extent he had difficulty determining "where he should be as well as being somewhat confused about why he is in prison." *Id.*, Ex. 5. PMNHP Cogburn's report also states that when off his medication plaintiff exhibited "pressured speech; flight of ideas, and other disorganized thinking, and respond[ed] to internal stimuli," which led to him creating "persistent disturbances on E unit day and night." *Id.*, Ex. 6.

Based on their clinical assessments both Dr. Davis and PMNHP Cogburn's reports conclude that plaintiff demonstrated signs of mental illness, was a danger to himself and others, and was gravely disabled. *Id.*, Exhs. 5, 6. The reports also state that plaintiff's prognosis is much better on medication. *Id.* Dr. Davis' report states that with medication plaintiff's prognosis is "good" and that he "appears nearly symptom free when [on] medication…maintains his hygiene, he is far less disturbed and distracted by delusions, he is able to participate in group therapies without the interference of psychotic mentation." *Id.*, Ex. 5. PMHNP Cogburn's report states that plaintiff's prognosis with medication is "fair" stating that there is some concern that "repeated and persistent manic episodes in the presence of past severe methamphetamine abuse has irreparably damaged his frontal lobe." *Id.*, Ex. 6. But the report also states that plaintiff's prognosis without medication is "poor" and that he "cannot manage successfully in any setting without appropriate psychotropic medication administration." *Id.*, Ex. 6.

On January 25, 2018, PMHNP Cogburn issued an emergency order directing that plaintiff receive injections of antipsychotic medication for each occasion when he refused to take the medication orally. *Id.*, Ex. 2 ("Primary Encounter Report" by PMHNP Cogburn dated Jan. 25, 2018). *This was the first instance of involuntary medication during the period plaintiff identifies in his complaint. Id.* On February 1, 2018, PMHNP Cogburn entered a new emergency order for involuntary administration of medication. *Id.*, Ex. 3 ("Primary Encounter Report by PMHNP Cogburn dated Feb. 1, 2018). *This was the second instance of involuntary medication during the period plaintiff identifies in his complaint. Id.* In total, plaintiff received medication by intramuscular injection on January 25, January 28, January 29, February 1, February 2, February 3 and February 4, of 2018, under these two emergency orders. Dkt. 21, Rule Decl., Ex. 3.

On February 6, 2018, Dr. Davis began the process for 14 days of involuntary administration of antipsychotic medication for plaintiff on a non-emergency basis. *Id. On February 6, 2018, defendant Cogburn entered a third order for involuntary medication. Id.*, Ex. 4 ("Primary Encounter Report" dated Feb. 6, 2018 by Calvin Cogburn, PMHNP). Plaintiff was given involuntary injections pursuant to that order on February 6, February 7, February 8, February 10, and February 11, of 2018.[4] Dkt. 21, Rule Decl., Ex. 3.

---

[4] "The Court notes that defendants do not mention the February 11, 2018, injection in their declarations in support of the motion but the video evidence submitted reflects that an involuntary injection was in fact given on that date. Dkt. 21, Rule Decl., Ex. 3." Dkt. 34, Fn. 2.

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 7

> On February 21, 2018, plaintiff was given 24 hours' notice of the administrative hearing and was informed that he could participate. Dkt. 20, Exh. 7. On February 22, 2018, plaintiff participated in an IAH for approval of 14 days of involuntary administration of antipsychotic medication. *Id.*, Exh. 8. The panel approved the involuntary administration of antipsychotic medication unanimously. *Id.*, Exh. 9. Plaintiff grieved this decision. Dkt. 21, Rule Decl., Exh. 2. In addition, plaintiff appealed the IAH decision. Dkt. 20, Symon Decl., Exh. 10. On March 5, 2018, DOC denied plaintiff's appeal finding DOC followed its policy regarding the involuntary administration of medication and plaintiff received all the process he was a due. *Id.*

Dkt. 34.

## DISCUSSION

To prevail on a Section 1983 claim, the plaintiff must establish (1) that he suffered a violation of a right protected by the Constitution, and that (2) the violation was proximately caused by a person acting under color of state law. *Crumpton v. Gates*, 847 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, the plaintiff must allege facts showing how individually named defendants caused, or personally participated in causing, the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When the Court considers a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.,* at 255. A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

Plaintiff argues defendant violated his Fourteenth Amendment procedural due process rights by forcing him to take antipsychotic medication involuntarily on an emergency basis more than twice in less than thirty days in violation of DOC policy. Dkt. 4. Defendant contends that he complied with DOC policy and plaintiff was afforded all requisite due process. Dkt. 50.

"The due process clause of the Fourteenth Amendment substantively protects a

person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment, and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citing *White v. Napoleon,* 897 F.2d 103, 111 (3rd Cir. 1990)) (internal citations omitted). Specifically, inmates possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-222 (1990). Substantive due process is satisfied, and a state may treat an inmate who has a serious mental illness with involuntary psychotropic medication, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. *Id.*, at 227. Further, the involuntary administration of antipsychotic medications "cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." *Harper*, 494 U.S. at 233, 110 S.Ct. 1028. Thus, in the context of involuntary antipsychotic medication, procedural due process is satisfied if the inmate is provided with notice, the right to be present at an adversarial hearing, and the right to present and cross-examine witnesses. *Id.*, at 235. Appointment of counsel is not required because a lay advisor who understands the psychiatric issues involved sufficiently protects an inmate's due process rights. *Id.*, at 236. Such procedural mechanisms adequately protect the Fourteenth Amendment rights of inmates, even when the ultimate substantive decision to medicate is left to medical personnel and not the court. *Id.*, at 231.

      An inmate's liberty interests are "adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." *Washington*, 494 U.S. at 231. By leaving the decision to medicate in the hands of an inmate's mental health providers, the court is able to avoid "unnecessary intrusion into either medical or

correctional judgments[.]" *Vitek v. Jones*, 445 U.S. 480, 496 (1980). The court gives "deference … to medical professionals who have the full-time responsibility of caring for mentally ill inmates" because those professionals "possess, as courts do not, the requisite knowledge and expertise to determine whether [antipsychotics] should be used in an individual case." *Washington*, 494 at 230 n.12. Because "[t]he risks associated with antipsychotic drugs are for the most part medical ones," the decision to medicate is "best assessed by medical professionals." *Id.* at 233.

In *Kulas v. Valdez*, 159 F.3d 453 (9th Cir. 1998), the Ninth Circuit inferred that the due process procedural protections described in *Washington v. Harper*, (494 U.S. 210, 221-222 (1990)) may not be applicable when an emergency situation exists requiring the involuntary administration of an antipsychotic medication. Citing the Fourth Circuit's opinion in *Hogan v. Carter*, 85 F.3d 1113 (4th Cir. 1996) which found such an emergency exception, the Ninth Circuit noted that, unlike in *Hogan*, "[t]here is no evidence that Kulas posed such an imminent and serious danger to himself or others that the minimal procedural requirements of *Harper*- notice and right to be present at and participate in a hearing-could not be met." *Kulas*, 159 F.3d at 456.

In *Hogan*, a doctor "personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from *imminent, self-inflicted harm*." *Hogan*, 85 F.3d at 1117 (citation omitted) (emphasis added). The Fourth Circuit reversed the district court's decision denying the doctor's motion to dismiss and remanded the matter with instructions to enter judgment for the defendant doctor. *Id.* at 1118. The Fourth Circuit commented:

> If Dr. Carter had not ordered the single dose of Thorazine that he did

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 11

> order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

*Id.* at 1118–19. In *Kulas*, the Ninth Circuit noted that, in contrast to *Hogan*, the inmate-patient was "merely loud and uncooperative." *Kulas*, 159 F.3d at 456. The Court determined that behavior by an inmate that was merely loud and uncooperative was insufficient to establish an emergency circumstance such that "the minimal procedural requirements of *Harper* – notice and the right to be present at and participate in a hearing – could not be met." *Id.*

In his complaint, plaintiff contends his procedural due process rights were violated because he was forced to take antipsychotic medication involuntarily on an emergency basis more than twice in less than thirty days between January 22, 2018 and February 13, 2018.[5] Dkt. 4. Defendant presents evidence in support of his motion that three involuntary medication orders were issued during the subject period, on January 25, 2018, February 1, 2018, and February 6, 2018, all by PMHNP Cogburn.[6] Dkt. 20, Symon Decl., Exhs. 2, 3, 4, 5, 6.

Defendant argues that he "only issued two emergency orders, followed by an order in connection with an IAH" and that, therefore, he did not violate DOC policy providing that no more than two emergency orders may be entered in a thirty-day period. Dkts. 19, 50. But the

---

[5] The Court notes that plaintiff's complaint does not specifically allege that the first two orders for emergency involuntary administrations of medication during the period from January 22, 2018 to February 13, 2018, violated his rights but argues his rights were violated by the additional (in excess of two) orders for emergency administrations of medication during that period. Dkt. 4.

[6] The Court notes that, in his complaint, plaintiff alleges four emergency orders were entered in thirty days. Dkt. 4, at 3. However, plaintiff points to no evidence either in his response to defendants' prior motion for summary judgment or in response to this motion, of a fourth order during the period in question. Dkts. 25, 52, 56. Furthermore, in responding to defendants' previous motion for summary judgment, plaintiff appeared to concede that he may have been mistaken about the fourth order noting that "there were a minimum of three orders" entered within thirty days during the subject period. Dkt. 25, at 4.

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 12

language of the DOC policy does not appear to the Court to support the defendant's interpretation. As detailed above, DOC Policy 630.540 provides, in relevant part, that certain medical providers may order *emergency* administration of involuntary antipsychotic medication for up to 72 hours, excluding weekends and holidays, without an IAH if they determine the offender suffers from a mental disorder, presents an *imminent* likelihood of serious harm to others or self, and will not likely respond to less restrictive medically acceptable alternatives, or such alternatives are unavailable or have not been successful. Dkt. 20, Symon Decl., Exh. 1 (emphasis added). The policy provides that "administration of involuntary medication for more than 72 hours for a single emergency, excluding weekends and holidays, will require an [IAH]" and "[n]o more than three emergency orders may be entered within a thirty-day period." *Id.*

Here, defendant acknowledges that three involuntary medication orders were entered within a thirty-day period. Although the third order was entered the day after the request for the IAH hearing was made, it was entered several weeks before plaintiff was given notice of the hearing and the hearing was conducted. The Court sees nothing in DOC Policy 630.540 stating that as long as an IAH hearing has been requested a provider may either involuntarily medicate a prisoner on a non-emergency basis or may medicate them more than twice within thirty days on an emergency basis, before the IAH hearing is conducted. However, whether or not defendant's actions violated DOC policy, the question before the Court is whether defendant's actions violated plaintiff's Fourteenth Amendment procedural due process rights.

In the report and recommendation addressing defendants' previous summary judgment motion, subsequently adopted by the Honorable Richard A. Jones, the undersigned found that defendant Cogburn had failed to meet his burden on summary judgment with respect to plaintiff's procedural due process claim. Dkt. 34. The Court noted that, in the context of

involuntary administration of antipsychotic medication, procedural due process is satisfied when a prisoner is provided with notice, the right to be present at an adversarial hearing, and the right to present and cross-examine witnesses. *Washington*, 494 U.S. at 235. The Court further found that:

> [T]he record here shows that when the third order for involuntary medication was issued on February 6, 2018, the initial request for a 14-day IAH had been made but none of the *Harper* procedural requirements (notice and hearing) had yet been met and, of course, the ultimate determination by the IAH Committee as to whether involuntary medication was appropriate, had not yet been made.
>
> The Ninth Circuit has inferred that an exception to these due process procedural requirements exists only in an emergency circumstance wherein an inmate "pose[s] such an imminent and serious danger to himself or others that the minimal procedural requirements of *Harper*-notice and right to be present at and participate in a hearing-[can]not be met." *Kulas*, 159 F.3d at 456. But here, defendants present no evidence, and in fact do not even argue, that the third involuntary medication order met this emergency exception standard. Defendants submit no evidence from PMHNP Cogburn, or any other provider, indicating that plaintiff was such an imminent and serious danger to himself or others that they were unable to comply with the *Harper* Due Process requirements before involuntarily medicating plaintiff. The record shows that two prior emergency involuntary medication orders were issued by defendant Cogburn on January 25, 2018, and February 1, 2018. But defendants present no evidence regarding the specific emergency circumstances supporting those orders either, or that a medical determination was made in issuing any of the involuntary medication orders that plaintiff was an *imminent* and serious danger to himself or others.[7][8]
>
> Accordingly, defendant Cogburn has failed to meet his initial burden on his motion for summary judgment with respect to plaintiff's procedural due process claim. However, because it appears possible that defendants may be able to replead their motion and present additional facts and evidence to support summary judgment on plaintiff's procedural due process claim, the undersigned recommends that defendants' motion for summary judgment be denied without prejudice to a subsequent appropriate summary judgment motion.[9]

Dkt. 34, at 19-21.

---

[7] "The Court notes that DOC policy requires that the provider issuing the emergency antipsychotic medication order 'document the justification, and when and how the medication is to be administered in the offenders health record.' Dkt. 20, Symon Decl., Exh. 1, § II.C.2. But defendants submit no evidence that such a justification was documented at the time nor do they submit a declaration from defendant Cogburn explaining the emergency basis for any of the three involuntary medication orders." Dkt. 34, n. 5.

[8] "Although plaintiff does not specifically challenge these first two orders, it appears to the Court that the circumstances under which the first two orders were issued may very well be relevant to the question of whether the third order was issued in accordance with procedural due process." Dkt. 34, n. 6.

[9] "The Court notes that this should not be interpreted by defendants as an invitation to file another summary judgment motion containing the same arguments and evidence." Dkt. 34, n. 7.

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 14

In the instant motion for summary judgment, defendant Coburn relies upon substantially the same evidence the Court previously found insufficient to warrant summary judgment. Dkt. 50. Defendant argues for the first time that this same evidence demonstrates the emergency exception to the procedures set forth in *Harper* was met. *Id.*, at 11-12. The Court disagrees. Defendant argues that plaintiff stopped voluntarily taking his medication and became increasingly delusional and dangerous. Dkt. 50, 6, 13. But the record also shows that plaintiff had initially stopped voluntarily taking his medication in July 2017, approximately six months before defendant Cogburn administered the "emergency" doses of antipsychotic medications in January and February 2018 and the February 2018 involuntary medication hearing was held. Defense counsel points to the Involuntary Antipsychotic Reports authored by defendant Cogburn on February 7, 2018, and Dr. Davis on February 6, 2018, as justification for the February 6, 2018, involuntary medication order. But these reports were generated for purposes of establishing at the hearing that involuntary antipsychotic medication was appropriate, not for purposes of explaining the emergency use of anti-psychotic medication prior to the hearing.

Defendant also points to statements in the Involuntary Antipsychotic Reports that, as recently as February 5, 2018, plaintiff had made statements concerning an attempt to kill another inmate. Dkt. 50, at 11. But the treatment note authored by Dr. Davis on that date reflects that plaintiff indicated that he had made this supposed attempt several months before and was asking at that time to be prosecuted for his actions. Dkt. 4, at 47. The Court also notes that defendants do not indicate whether they are aware of or have any record of the incident plaintiff is referring to actually occurring. Defendant also points to a statement in defendant Cogburn's report that plaintiff had twice stated on his most recent placement in the close observation area (COA), in January 2018, that he could not promise he would not murder staff "in context of involuntary

1  antipsychotic injection about to be administered." Dkt. 50, at 11; Dkt. 20, at 28. In opposing

2  defendants' motion, plaintiff denies threatening to kill staff. Dkt. 52, at 2. Furthermore, the fact

3  that these statements were made in the context of involuntary antipsychotic injections about to be

4  administered demonstrates that they could not have been the emergency basis for defendant

5  Cogburn's decision to involuntarily administer antipsychotic medication without a hearing in the

6  first instance. The Court also notes that the relevant treatment note appears to indicate that

7  plaintiff allegedly made these statements in response to staff informing him that they would be

8  administering involuntary antipsychotic injections and that plaintiff expressed he was adamantly

9  opposed to this in part because he believed antipsychotic medications had made him homicidal in

10 the past. Dkt. 4-1, at 2. The treatment note reflects that it was in this context that plaintiff

11 allegedly indicated that he could not guarantee he would not attempt to murder staff if

12 administered involuntary antipsychotic medications. *Id.*

13    The Court does not deny that the statements defendant points to, in addition to plaintiff's

14 significant mental health history, are concerning. But these statements on their own, read in

15 context, do not establish, as a matter of law, that plaintiff such an *imminent* and serious danger to

16 himself or others that the minimal procedural requirements of *Harper* could not be met. There is

17 no evidence in the record linking these statements or other evidence to a determination by

18 defendant or any other medical provider that plaintiff was an *imminent* and serious danger to

19 himself or others. Noticeably missing from defendant's motion is any declaration or evidence

20 from defendant Cogburn himself, or any other medical provider, explaining the emergency basis

21 for the decision to administer involuntary antipsychotic injections to plaintiff prior to the

22 involuntary medication hearing. The Court also notes that, while not specifically at issue in this

23 action, the record shows defendant Cogburn in fact issued two prior emergency orders for

involuntary antipsychotic injections in January and February 2018, before any request for an involuntary medication hearing was issued, and the emergency basis for those orders is also unclear.

The Court is cognizant of the deference that must be afforded to medical providers' expertise in deciding to administer involuntary antipsychotic medication. However, here, defendant asks the Court to infer that plaintiff was an imminent danger to himself based on somewhat ambiguous statements by plaintiff about possible behavior months in the past and statements made in reaction and opposition to the administration of the antipsychotic medication itself (which plaintiff also denies making). The defendant asks the Court to make this inference despite the absence of any determination in the record from a medical provider stating or otherwise specifically indicating that they believed plaintiff was, in fact, an *imminent* danger to himself or others at the time. Under the circumstances, the Court concludes that defendant has failed to establish the absence of genuine issues of material fact and that he is entitled to judgment as a matter of law with respect to plaintiff's procedural due process claim.

Defendant also argues that he is entitled to qualified immunity from damages. Unless plaintiff makes a two-part showing, qualified immunity shields government officials from liability. The plaintiff must show both: the official(s) violated a federal statutory or constitutional right, and -- at the time of the alleged act or failure to act there was clearly established law that defined the contours of the federal right objectively putting the official(s) on notice – i.e., every reasonable official would understand that what they are doing is unlawful. *Escondido v. Emmons*, 139 S.Ct. 500 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the plaintiff with

1  respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam). If there is a
2  genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable
3  officer that their conduct was unlawful under the circumstances they confronted, and (2)
4  Whether the defendant's conduct violated a constitutional right" then summary judgment
5  granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston,* 883 F.3d 865, 871-
6  72 (9th Cir. 2018).

7        To determine whether there was clearly established law, the Court has stated, "[w]hile
8  there does not have to be a case directly on point, existing precedent must place the lawfulness of
9  the particular [action] beyond debate"; and the Court has also observed, "there can be the rare
10 obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though
11 existing precedent does not address similar circumstances." *Wesby,* 138 S.Ct. at 590. A clearly
12 established right exists if "controlling authority or a robust consensus of cases of persuasive
13 authority" have held, on facts that are close or analogous to the current case, that such a right
14 exists. *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019).

15       The Court has already determined that defendant has failed to establish the absence of
16 genuine issues of material fact concerning whether plaintiff's procedural due process rights were
17 violated by the involuntary administration of antipsychotic medication pursuant to the February
18 6, 2018, order. Thus, defendant is not entitled to qualified immunity under the first prong of the
19 qualified immunity test.

20       Defendant makes no specific arguments with respect to the second prong of qualified
21 immunity – i.e., that the constitutional right in question was not clearly established at the time.
22 The Court declines to address arguments defendant has not specifically raised himself. However,
23 the Court does note that it was clearly established at the time of the events giving rise to

1    plaintiff's claims that inmates possess "a significant liberty interest in avoiding the unwanted

2    administration of antipsychotic drugs under the Due Process Clause of the Fourteenth

3    Amendment", that the administration of such drugs "cannot withstand challenge if there are no

4    procedural safeguards to ensure the prisoner's interests are taken into account" and that, in the

5    context of involuntary medication, procedural due process is satisfied when an inmate is

6    provided with notice, the right to be present at an adversarial hearing, and the right to present and

7    cross-examine witnesses. *Washington*, 494 U.S. at 221-222, 233, 235. Moreover, although it

8    appears the Ninth Circuit has only inferred the emergency exception to the due process

9    procedural safeguards described in *Harper* as the law of the Circuit, the law was clear enough at

10   the time to state that, to be involuntarily medicated under an emergency exception, an inmate

11   must pose "such an imminent and serious danger to himself or others that the minimal procedural

12   requirements of *Harper*-notice and right to be present at and participate in a hearing-could not be

13   met." *Kulas*, 159 F.3d at 456.

14       As defendant Cogburn has not presented sufficient evidence that plaintiff was an

15   *imminent* and serious danger to himself or others, or presented any specific, non-conclusory,

16   argument regarding the clearly established law prong of the qualified immunity analysis, the

17   Court concludes that he has failed to establish he is entitled to qualified immunity on plaintiff's

18   Fourteenth Amendment procedural due process claim. Accordingly, the Court recommends

19   plaintiff's motion for summary judgment on qualified immunity grounds be denied as well.

20   **CONCLUSION**

21       The Court recommends defendant Cogburn's motion for partial summary judgment (Dkt.

22   50) be DENIED.[10]

---

[10] The Court notes that it recommended denying defendants' first motion for summary judgment (Dkt. 19) without prejudice with respect to the sole remaining procedural due process claim because it appeared

REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT - 19

**OBJECTIONS AND APPEAL**

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **April 15, 2021.** The Clerk should note the matter for **April 16, 2021**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed **10 pages**. The failure to timely object may affect the right to appeal.

DATED this 25th day of March, 2021.

BRIAN A. TSUCHIDA
United States Magistrate Judge

---

possible that the defendant could replead the motion and present additional facts and evidence to support summary judgment. Dkt. 34. However, as the instant motion also fails, the Court does not recommend that defendant be afforded a further opportunity to move for the same relief.